# 24 - 448

# In The United States Court of Appeals for the Second Circuit

UNITED STATES OF AMERICA

*Appellee,*

—v.—

GEORGE GULDI,

*Defendant,*

VICTORIA DAVIDSON,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**BRIEF OF APPELLANT VICTORIA DAVIDSON**

Ezra Spilke
LAW OFFICES OF EZRA SPILKE
1825 Foster Avenue, Suite 1K
Brooklyn, New York 11230
Tel: (718) 783-3682
*Counsel for Defendant-Appellant Davidson*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................... ii

STATEMENT OF JURISDICTION ...................................................1

ISSUES FOR REVIEW ......................................................................1

STATEMENT OF THE CASE ............................................................2

SUMMARY OF ARGUMENT ..........................................................13

ARGUMENT ....................................................................................14

   I.   THE GOVERNMENT PRESENTED INSUFFICIENT EVIDENCE TO PROVE THAT DAVIDSON'S REPRESENTATIONS TO DITECH WERE MATERIAL ....................................................................................14
      A.   Standard of review. ..........................................................14
      B.   Discussion ..........................................................................15

   II.   THE DISTRICT COURT ABUSED ITS DISCRETION WHEN IT DENIED DAVIDSON'S MOTIONS FOR SEVERANCE OR A MISTRIAL ..21

   III.   RESENTENCING IS REQUIRED BECAUSE THE DISTRICT COURT MISCALCULATED THE GUIDELINES RANGE AND THE WRITTEN JUDGMENT VARIES FROM THE ORAL PRONOUNCEMENT .................25
      A.   Standards of review.............................................................25
      B.   Discussion. .........................................................................26

CONCLUSION ................................................................................30

CERTIFICATE OF COMPLIANCE ................................................31

## TABLE OF AUTHORITIES

<u>Cases</u>

*Gall v. United States*, 552 U.S. 38 (2007) ..........................................................25, 26

*Kungys v. United States*, 485 U.S. 759 (1988) ...............................................20

*Neder v. United States*, 527 U.S. 1 (1999) .......................................................15, 16

*United States v. Barrera*, 834 F. App'x 690 (2d Cir. 2021) ...............................25

*United States v. Basciano*, No. 05-CR-060 (NGG), 2007 WL 3124622 (E.D.N.Y. Oct. 23, 2007)...............................................................................................23

*United States v. Bonito*, 57 F.3d 167 (2d Cir. 1995) ......................................28

*United States v. Calderon*, 944 F.3d 72 (2d Cir. 2019).................................16

*United States v. Carpentier*, 689 F.2d 21 (2d Cir. 1982) ...............................22

*United States v. Casamento*, 887 F. 2d 1141 (2d Cir. 1989)...........................22

*United States v. Colombo*, 909 F.2d 711 (2d Cir. 1990) ...............................24

*United States v. Coplan*, 703 F.3d 46 (2d Cir. 2012) ...................................15

*United States v. D'Amato*, 39 F.3d 1249 (2d Cir. 1994)................................15

*United States v. DeMartino*, 112 F.3d 75 (2d Cir. 1973) ...............................27

*United States v. Ebbers*, 458 F.3d 110 (2d Cir. 2006)...................................25

*United States v. Facchini*, 874 F.2d 638 (9th Cir. 1989)...............................20

*United States v. Fitzgerald*, 232 F.3d 315 (2d Cir. 2000) ...............................27

*United States v. Gaudin*, 515 U.S. 506 (1995)...............................................16

*United States v. Glenn*, 312 F.3d 58 (2d Cir. 2002) ......................................15

*United States v. Ismail*, 97 F.3d 50 (4th Cir. 1996)........................................20

*United States v. Jolly*, 142 F.3d 552 (2d Cir. 1998) ......................................27

*United States v. Litvak*, 808 F.3d 160 (2d Cir. 2015)....................................19

*United States v. Litvak*, 889 F.3d 56 (2d Cir. 2018).......................................16

*United States v. Lorenzo*, 534 F.3d 153 (2d Cir. 2008)...............................14

*United States v. Marquez*, 506 F.2d 620 (2d Cir. 1974)...............................29

*United States v. Mittelstaedt*, 31 F.3d 1208 (2d Cir. 1994)...........................15

*United States v. Novak*, 443 F.3d 150 (2d Cir. 2006).................................14

*United States v. Page*, 657 F.3d 126 (2d Cir. 2011)......................................21

*United States v. Pugh*, 945 F.3d 9 (2d Cir. 2019) ..........................................26

*United States v. Qaisi*, 779 F.2d 346 (6th Cir. 1985) ...................................20

*United States v. Ramos*, 346 F. Supp. 2d 567 (S.D.N.Y. 2004)......................21

*United States v. Rigas*, 490 F.3d 208 (2d Cir. 2007)................................16, 18

*United States v. Rodriguez*, 140 F.3d 163 (2d Cir. 1999) ..............................16

*United States v. Rosario*, 386 F.3d 166 (2d Cir. 2004) ...............................26

*United States v. Scully*, 877 F.3d 464 (2d Cir. 2017)...............................14

*United States v. Tutino*, 883 F.2d 1125 (2d Cir. 1989) ...............................22

*United States v. Twersky*, 133 F.3d 908 (2d Cir. 1997)................................28

*United States v. Weaver*, 860 F.3d 90 (2d Cir. 2017)..............................16
*United States v. Williams*, 585 F.3d 703 (2d Cir. 2009)..........................24
*United States v. Yannai*, 791 F.3d 226 (2d Cir. 2015)..............................24
*United States v. Zemlyansky*, 908 F.3d 1 (2d Cir. 2018)............................22
*Universal Health Servs., Inc. v. United States*, 579 U.S. 176 (2016)....................15
*Zafiro v. United States*, 506 U.S. 534 (1993) ..................................22

Statutes

18 U.S.C. § 3553(a)(4)(A)(ii) ...............................................27
18 U.S.C. § 3582(c) ........................................................28

Other Authorities

Fed. R. Crim. P. 14(a)......................................................22
Fed. R. Crim. P. 35 ........................................................28
Fed. R. Crim. P. 8(b) ......................................................21
U.S. Sent'g Guidelines § 4C1.1(a)(1) (2023)..............................29
U.S. Sent'g Guidelines § 5C1.1, application note 10(B) (2023)............................13

## STATEMENT OF JURISDICTION

Victoria Davidson appeals from a judgment of conviction pursuant to his conviction after trial in the Southern District of New York (Hellerstein, J.). The district court had jurisdiction under 18 U.S.C. § 3231. The district court entered judgment on February 20, 2024, Dkt. 240.[1] Appellant filed a timely notice of appeal on January 9, 2024. Dkt. 241. The jurisdiction of this Court rests on 28 U.S.C. § 1291.

## ISSUES FOR REVIEW

1. Whether the government presented insufficient evidence to prove that Davidson's representations to Ditech were material.

2. Whether the district court abused its discretion when it denied Davidson's motions for severance or a mistrial.

3. Whether resentencing is required because the district court miscalculated the guidelines range and because the written judgment varied from the oral pronouncement.

---

[1] "A" refers to the appendix filed with this brief; "PSR" or "Presentence Report" refers to the Presentence Investigation Report prepared by the United States Probation Department (the "Probation Department") in advance of Davidson's sentencing; "GX" refers to government trial exhibits which, unless otherwise specified, are included in the appendix filed with this brief.

## STATEMENT OF THE CASE

Victoria Davidson was convicted after a jury trial of wire fraud, in violation of 18 U.S.C. § 1343 (Count Three), bank fraud, in violation of 18 U.S.C. § 1344 (Count Five), and conspiracy to commit wire and bank fraud, in violation of 18 U.S.C. § 1349 (Count One).

The facts at trial stemmed from the payment of an insurance settlement that was received in 2017 by a mortgage servicer called Ditech Financial LLC. In 2008, codefendant George Guldi's home in Suffolk County, New York burned down. Guldi received an insurance check for $863,473.30, which he was required to use for rebuilding his house or paying his mortgage. However, Guldi used the money for other purposes, resulting in a grand larceny conviction and imprisonment. The Suffolk County DA's Office subsequently froze Guldi's bank accounts, which contained a total of $270,924.02. (A 60; GX 1101).[2]

In 2014, Countrywide Home Loans and Bank of America sued JP Morgan Chase Bank for sending Guldi the fire insurance money. In 2017, the banks settled, and Chase Bank sent $253,236 to Ditech, which was servicing Guldi's mortgage on the burned-down home. The settlement required Chase to make efforts to release $221,764 of Guldi's frozen funds. The DA's Office indicated willingness to

---

[2] GX 1101 and 1103 are included in the government's appendix in the lead case. *See* Gov. App'x, 23-6909, (Mar. 15, 2024), ECF 40.1.

-2-

support this release. Guldi was not a party to this confidential settlement. (A 61, 90; GX 132, 1103). And neither Guldi nor Davidson was aware of the settlement prior to August 2017. (GX 1103).

Ditech treated the settlement money as a payment from Guldi towards his mortgage. Ditech sent Guldi a letter at his correctional institution, stating they had received a payment of $253,236.00 on March 15, 2017. The letter explained that this amount was insufficient to cure the default, as $1,168,362.23 was needed to bring the account current. The letter instructed Guldi to call a 1-800 number, which incarcerated individuals cannot do. (A 53, 61; GX 130,[3] GX 1103).

On March 28, 2017, Guldi called Victoria Davidson, his former romantic partner, and read her the Ditech letter. He believed the DA had directed Chase to send his seized money to Ditech without a court order. Guldi told Davidson, "If you want to tackle this, and we manage to get -- break it loose, I'll give you ten percent." He instructed her to ask Ditech where they got the money from and said she could "do whatever" she wanted with the information but advised her to "take a harder line with them" and "go with what works." (GX 204T; A 54-56)

The next day, Guldi reiterated his belief that the DA was involved and advised Davidson to ask Ditech about the source of the payment. Davidson learned

---

[3] GX 102T, 126, 130, and 1006 are included in the government's appendix in the lead case. *See* Gov. App'x, 23-6909, (Mar. 15, 2024), ECF 40.1.

she needed an authorization letter from Guldi to act as his agent. Unbeknownst to Guldi, Davidson wrote a letter authorizing her to manage the return of the $253,236 payment and directing Ditech to wire the money to her personal account. (GX 206T, 207T; A 132-134; GX 102T, 126, 209T, 1006). She signed as Guldi.

On April 14, 2017, Guldi told Davidson he no longer wanted her to represent him in getting the money back from Ditech. However, after an in-person visit on April 16, 2017, Guldi and Davidson resumed discussing the plan. Guldi increased Davidson's potential share to twenty percent and gave her instructions on how to handle the money if she received it. (GX 211T at 2[4]; 213T).

Meanwhile, within Ditech, the issue of the return of funds to Guldi moved through the various departments, including collections, foreclosure cash and figures, Green Tree Loan Servicing (GTLS)[5] Reimbursement, and upper management.

Michele Fisher, who was a project manager in Ditech's foreclosure cash and figures department, testified at trial for the government. The internal organization of Ditech involved multiple departments including collections, customer service, and Fisher's foreclosure cash and figures department. (A 74). Fisher's duties

---

[4] GX 211T is included in the government's appendix in the lead case. *See* Gov. App'x, 23-6909, (Mar. 15, 2024), ECF 40.1.

[5] GTLS was the department that had access to Ditech's bank accounts. (A 67).

included overseeing processors who handled requests related to foreclosures. (A 64-65). Martin Burd was an assistant vice president over all of servicing, which included collections, customer service, and Fisher's group. (A 72). The process for handling reimbursement requests involved multiple steps and departments, with Fisher's team reviewing requests and forwarding them to GTLSR for processing. (A 68-69).

Fisher testified that for reimbursement requests over $100,000, approval from senior management was required (A 69). In this instance, Burd was the person with decision-making authority for the reimbursement to Davidson. (A 73). Fisher stated that the only information Burd would have looked at was an April 19, 2017, email from her to Burd containing a snapshot of information Fisher cut and pasted from Ditech's internal notes. This snapshot contained limited information from a collections department note dated April 10, 2017. (A 70-71). Fisher's email stated:

> GTLSR,
>
> It appears that the funds that are in FIS were remitted to Ditech in error. Can we please have the funds returned to the remitter per the borrower's request below.
>
> Attempted Contact victoria davidson, Connected To: 9175444161, Origin of Contact: Outbound. OUTCOME: TC, FOLLOW-UP DATE: 4/12/2017, INFORMED THAT ON [sic] ACCIDENTLY SENT FUNDS IN ON THE ACCOUNT AND IT WAS NOT THE CORRECT AMOUNT. NEEDED TO BRING THE ACCOUNT OUT

OF THE FORECLOSURE. INFORMED WILL TAKE A LITTLE
MORE TIME TO GET THE FUNDS BACK TO [sic].

GX 136A. Fisher testified that she could determine from the note that it referred to

a call Ditech placed to Davidson and that the note was made by someone in the

collections department at the time of the call. (A 71)

Fisher also helped to interpret for the jury Ditech's internal notes. (GX 129).

Those notes reflected that Davidson first contacted Ditech's collections department

on March 29, 2017. (GX129, p. 10). She had multiple conversations with various

representatives over the following days.

On April 10, 2017, at 10:41:59 AM, a collections representative made a note

about Davidson's request to return the funds. (GX129, p. 9). This note became the

basis for a task request to the foreclosure cash and figures department. On April

19, 2017, Fisher, a project manager in the foreclosure cash and figures department,

received the task request. (GX129, p. 7). Samuel Griffiths, a processor under

Fisher's supervision, was tasked with researching the request. (GX129, p. 7-8).

Fisher emailed GTLSR on April 19, 2017, at 1:31 PM, requesting the return

of funds. (GX136A, p. 1). Nicholas Swanson from GTLSR responded at 3:27 PM,

stating that AVP approval was needed due to the amount exceeding $200,000.

(GX136A, p. 1). Samuel Griffiths then emailed Martin Burd, the AVP, at 4:35 PM

on April 19, 2017, requesting approval to return the funds. (GX129, p. 8).

Martin Burd approved the request at 5:20:18 PM on April 19, 2017. (GX129, p. 8). After Burd's approval, GTLSR began processing the return of funds. On April 20, 2017, there were discussions about whether to send the funds by wire transfer or check. (GX129, pp. 6-7).

The process from initial task creation to AVP approval took about 9 days (April 10 to April 19). The actual decision-making process at the AVP level appears to have been very quick, with Burd approving the request within an hour of receiving it. Burd had no direct contact with Davidson and there is no evidence that he reviewed the full history of her interactions with Ditech.

On April 20, 2017, Ditech wired the money to Davidson's personal Wells Fargo account, increasing her balance from negative $115 to positive $253,121. Davidson began spending and moving the money, including by paying off Guldi's debts and her own student loans. (A 62, 63, 75-79; GX 101T-19T, 1001, 1109, 218T, 403-06, 1003, 1113).[6]

On May 1, 2017, Davidson informed Guldi that she had received the money. Guldi responded, "Wow. They wired it to you? That's interesting, we're going to have some real fun with this." Guldi instructed Davidson to convert most of the

---

[6] GX 403-06, 101T-19T, 1001, 1003, 1109 and 1113 are included in the government's appendix in the lead case. *See* Gov. App'x, 23-6909, (Mar. 15, 2024), ECF 40.1.

money into bank checks and some into cash, advising her to "never take ten at a time, you take nine, because there's additional reporting . . . requirements on ten." (GX 221T at 1-3, 20-21). Over the next six weeks, Davidson used the money to pay Guldi's debts and for personal expenses, including a trip to Italy. (GX 403-04, 801, 1003, 1004, 1005, 1113, 221T). In August 2017, Ditech requested that Guldi and Davidson return the funds. (PSR ¶ 34).

At trial, Guldi's counsel immediately placed all the blame on Davidson, arguing that Davidson made material misrepresentations to Ditech to secure the funds and that she was working independently. In opening statements Guldi's counsel argued as follows:

- "You will learn that Ms. Davidson sent an authorization letter to Ditech on April 7, 2017, just two days after Mr. Guldi asked her not to contact them again. Now, this authorization, it was allegedly signed by Mr. Guldi, and it states that Ditech should wire the $250,000 to a bank account, but not Mr. Guldi's bank account, to Ms. Davidson's bank account. And you will learn that Mr. Guldi never agreed to this or had knowledge that Ms. Davidson had done this . . . ." (A 49-50).

- "When Ms. Davidson convinced Ditech to wire the $250,000 directly to her, Mr. Guldi had no idea. Ms. Davidson did not tell Mr. Guldi that she had the money for about 11 days, even though she spoke with him several times after she received the money." (A 50).

- "There were many mistakes made in this case. Ditech made a mistake when they credited Mr. Guldi's account with the money from the civil settlement. Ditech made another mistake when they sent Mr. Guldi a letter asking him if he wanted his money back from the payment. Mr. Guldi made a mistake when

-8-

he relied on that letter, and he made another mistake when he relied on Ms. Davidson." (A 50-51).

At the conclusion of Guldi's opening statement, Davidson objected and moved for a mistrial. Counsel for Ms. Davidson indicated that Mr. Guldi's defense team was acting as a second prosecutor, which was a surprise to Ms. Davidson's defense team, and alluded to an understanding that Ms. Davidson would abandon blaming Guldi because their good-faith defenses would complement each other. (A 52).

Ms. Davidson again moved for a mistrial after counsel for Guldi suggested in the cross-examination of Agent Maria Font that Ms. Davidson had a motive to steal Ditech's funds because she was destitute and tried to establish Davidson's deception of Guldi on the basis of her forgery of Guldi's signature. (*See* A 80). The clear implication of the questioning was that Guldi was a victim of Davidson's deceit and was thus not responsible for stealing from Ditech.

Counsel for Davidson renewed the severance and the mistrial motions, stating:

> MS. McCARTHY: . . . We have two prosecutors in the room right now. Okay. Ms. Giwa tried to use this witness to establish that Ms. Davidson forged a signature of Mr. Guldi. . . .
>
> THE COURT: Wait. Wait. Where was that?
>
> MS. McCARTHY: Yes. That was what she was doing with showing the signature, and you asked her not to be to become --
>
> THE COURT: I told her she couldn't do it.

-9-

MS. McCARTHY: Now she's putting up the chart to show Ms. Davidson's negative bank account to, I assume, Ms. Giwa can correct me, but to show just how desperate Ms. Davidson was for money and how she used the money.

I don't need two prosecutors, Judge. It is unfair to Ms. Davidson, and she's setting up the summation which is Victoria Davidson is the criminal here. Judge, that's how it's going to go in summation. I am going to be objecting a whole lot.

(A 82-83).

During summation, Guldi renewed the attack on Davidson, arguing, for example as follows:

- "Ms. Davidson did not wait. As you can see, the bulk of the Ditech calls occur between [April 5 and 14 during which time Davidson and Guldi did not speak]. The fax is uploaded on April 7. Between those two dates, there is simply no way that Mr. Guldi wrote that letter." (A 84).

- "Meanwhile, while Ms. Davidson is not being truthful with Mr. Guldi, the money is moving." (A 86).

- "Even after he learned 12 days later that Ms. Davidson had the money, there is no indication that he ever learned the truth about her interactions with Ditech. He did not aid. He did not cause. He did not agree with any of the misstatements or lies. He simply didn't even know about them." (A 87-88).

- "Mr. Guldi knows that that money should never have been wired to Victoria Davidson. It should have gone by a bank check into an account in his name, and so he wanted to gently ensure that he had some protection." (A 89).

Davidson made a continuing objection to Guldi's line of argument. (A 85).

On January 25, 2023, the jury found Davidson guilty of Counts One, Three and Five. (A 91-93). The sentencing hearing began on October 4, 2023. (A 259).

The district court heard argument on Davidson's objections to a Guidelines enhancement for sophisticated means. (A 260-63). The court also heard the statements of counsel and the defendant. (A 266-73; A 273-74).

The district court calculated the Guidelines range using the 2021 version of the Sentencing Guidelines as 37 to 46 months, (A 263), and then orally pronounced its intended sentence, (A 274-76, A 278-79). And, finally, the court scheduled Davidson's surrender date for sixty days after this Court's mandate issued. (A 279-80). The government objected to the surrender date, and the court continued the conference to a later date to hear argument on and resolve the issues of restitution and surrender. (A 282).

The sentencing hearing continued on December 6, 2023. Prior to that appearance, the parties negotiated and agreed to a reduced restitution amount. (Dkt. 216). The court heard argument on bail pending appeal, but, after the government requested a further opportunity to brief the issue, the court continued the sentencing hearing again. (A 302).

The continued sentencing hearing took place on January 9, 2023. Prior to the appearance, Davidson wrote the court maintaining that it must use the 2023 version of the Guidelines at sentencing. (Dkt. 225; *see* Dkt. 223 at 4-5). At the sentencing hearing, counsel and the court had the following colloquy:

> MR. SPILKE: The question is: What is -- has sentence been imposed,
> [because] that drives what version of the guidelines we're dealing

-11-

with. Was sentence imposed on October 4, or is it being imposed today is the question.

THE COURT: I opened it up, and impose the sentence today.

MR. SPILKE: So by imposing sentence today, the [G]uidelines [M]anual is the 2023 [G]uidelines [M]anual.

THE COURT: I have it in front of me.

MR. SPILKE: So now, before -- her guidelines range is actually two -- her offense level is actually two levels lower.

THE COURT: Mr. Spilke, I, in effect, gave her the departure you asked by giving her nine months and nine months home confinement. And I read through what you say that normally -- that in some cases you would get a departure, but you're not entitled to it here.

MR. SPILKE: Just for clarification purposes, your Honor has considered 5C1.1, the departure under 5C1.1 is denied . . . .

THE COURT: That's right.

(A 314-15).[7] Despite acknowledging that the 2023 Manual controlled, the court did not adjust the Guidelines range. On January 9, 2024, the court imposed the sentence it orally pronounced on October 4, 2023: nine months' incarceration to be

---

[7] In 2023, the Sentencing Commission amended Application Note 10(B) of § 5C1.1 of the Sentencing Guidelines, which states:

A departure, including a departure to a sentence other than a sentence of imprisonment, may be appropriate if the defendant received an adjustment under §4C1.1 (Adjustment for Certain Zero-Point Offenders) and the defendant's applicable guide-line range overstates the gravity of the offense because the offense of conviction is not a crime of violence or an otherwise serious offense. *See* 28 U.S.C. § 994(j).

U.S. Sent'g Guidelines § 5C1.1, application note 10(B) (2023).

followed by three years of supervised release of which the first nine months would be under home confinement. (A 275; *see* A 314-15 (clarifying that the court was imposing sentence that day)).

## SUMMARY OF ARGUMENT

In order to prove Davidson's guilt of each count, the government was required to prove beyond a reasonable doubt not only misrepresentation but also that the misrepresentation was material, meaning that it mattered in a meaningful way to the decisionmaker. Here, the Ditech witnesses testified in detail about Ditech's internal decision-making procedure for processing reimbursements. What that testimony made clear was that the misrepresentations were incapable of influencing Ditech to reimburse Guldi.

The district court abused its discretion when it denied Davidson's motions for a severance and for a mistrial. Co-defendant Guldi's defense operated as a second prosecutor. His entire defense depended on placing the blame entirely on Davidson, prejudicing her irreparably.

Finally, the sentencing hearing was continued twice, and the district court explicitly stated that it was imposing sentence on the date of the final appearance, which was after the 2023 Guidelines Manual went into effect. However, the district court used the 2021 Guidelines Manual to calculate Davidson's Guidelines range. Additionally, the judgment states that the sentence was imposed at the first

-13-

appearance, which conflicts with the court's oral pronouncement. Resentencing is necessary.

## ARGUMENT

### I. THE GOVERNMENT PRESENTED INSUFFICIENT EVIDENCE TO PROVE THAT DAVIDSON'S REPRESENTATIONS TO DITECH WERE MATERIAL

#### A. Standard of review.

This Court reviews the sufficiency of the evidence *de novo*, determining whether a rational jury could find the essential elements of the crime beyond a reasonable doubt. *See United States v. Novak*, 443 F.3d 150, 157 (2d Cir. 2006). The government "at all times bears the burden of proving beyond a reasonable doubt that the defendant had the state of mind required for conviction on a given charge." *United States v. Scully*, 877 F.3d 464, 476 (2d Cir. 2017).

In evaluating sufficiency, the Court is required to "take a hard look at the record and to reject those evidentiary interpretations and illations that are unreasonable, insupportable, or overly speculative." *Blasini-Lluberas*, 169 F.3d at 62 (internal citations and quotation marks omitted); *see also United States v. Lorenzo*, 534 F.3d 153, 159 (2d Cir. 2008) (internal citation, quotation marks and alterations omitted) ("[S]pecious inferences are not indulged, because it would not satisfy the Constitution to have a jury determine that the defendant is probably guilty").

-14-

If after the Court has closely scrutinized the record and disregarded findings based on speculation, "the evidence is such that reasonable jur[ors] must necessarily have . . . a [reasonable] doubt, the judge must require acquittal, because no other result is permissible within the fixed bounds of jury consideration." *Taylor*, 464 F.2d at 243. Moreover, if the evidence "gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt." *United States v. Coplan*, 703 F.3d 46, 69 (2d Cir. 2012). In other words, where the evidence is "in equipoise," a judgment of acquittal is required. *Id.*; *see also United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002); *United States v. D'Amato*, 39 F.3d 1249 (2d Cir. 1994).

## B. Discussion

Materiality is an element of every crime of conviction in this case. *See Neder v. United States*, 527 U.S. 1, 25 (1999).[8] "The materiality standard is demanding." *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 194 (2016). Information is material only if it has a "natural tendency to influence, or is capable of influencing, the decision of the decision-making body to which it was

---

[8] Where the underlying object of an alleged conspiracy is found to be legally insufficient, the conspiracy count must be reversed. *See United States v. Mittelstaedt*, 31 F.3d 1208, 1218-20 (2d Cir. 1994).

addressed." *Neder*, 527 U.S. at 16. The essence of materiality is captured by the question: "[W]ould the misrepresentation actually matter in a meaningful way to a rational decisionmaker?" *United States v. Calderon*, 944 F.3d 72, 86 (2d Cir. 2019).

A statement is immaterial if it is not capable of influencing the decision of a decision-maker. *See, e.g.*, *United States v. Rodriguez*, 140 F.3d 163, 168 (2d Cir. 1999) (reversing bank fraud conviction where false statement made in savings account application could not have influenced the bank's decision to permit the defendant to withdraw funds from that account). This is an objective test, *United States v. Litvak*, 889 F.3d 56, 59 (2d Cir. 2018), and is evaluated from the perspective of a reasonable decision-maker, *United States v. Gaudin*, 515 U.S. 506, 512 (1995).

To determine materiality, "[a]nalysis of the misrepresentations must be in the context in which they are made." *United States v. Rigas*, 490 F.3d 208, 231 (2d Cir. 2007). Neither the federal wire fraud nor bank fraud statute require the government to prove that a victim relied upon the defendant's misstatements. *Neder*, 527 U.S. at 24-25; *United States v. Weaver*, 860 F.3d 90, 95 (2d Cir. 2017). However, "[i]n the context of an objective decisionmaking process," the determination of whether a statement is material "requires examination of the factors the decision-maker would employ, and the degree to which a

-16-

misrepresentation would be capable of influencing the decision of the decisionmaking body." *Rigas*, 490 F.3d at 235.

As the Ditech witnesses made unmistakably clear, Ditech used an "objective decision-making process" for deciding whether to reimburse a borrower. *Rigas*, 490 F.3d at 235. Fisher, a project manager in the foreclosure group, testified about the Ditech's internal policy that controlled reimbursements. Under Ditech's policy, when customer service or collections received a reimbursement request from a borrower, they would open a task for Fisher's group to research the request. (A 66). Processors in the group researched whether Ditech was authorized to process the reimbursement. (A 66).

An essential step involved the processor handling the request contacting GTLS Reimbursement, which had access to the Ditech bank accounts, to determine whether Ditech had truly received the payment being reimbursed and who made the payment. (A 67, A 69). Fisher's group relied solely on the information received from GTLS Reimbursement. (A 67).

Once the foreclosure group was satisfied with GTLS Reimbursement's assurances, the assistant vice president's decision to issue the check was nothing more than a rubber stamp. Here, the only information that AVP Martin Burd reviewed was a brief email (A 71-71; *see* GX 136A). It took Burd mere minutes to approve the request. (GX129, p. 8). Davidson never communicated with Fisher's

-17-

group, with GTLS Reimbursement, with AVP Burd or with anyone beyond front-line, customer-service agents.

When this type of objective decision-making process is employed, a misstatement is immaterial if it could not influence the outcome of the process. *See Rigas*, 490 F.3d at 235. The defendants in *Rigas* were convicted of two counts of bank fraud, 18 U.S.C. § 1344, for filing loan compliance certifications that misstated their companies' leverage ratios in order to obtain more favorable interest rates. *See* 490 F.3d at 213-14, 217-18, 231-34. The defendants' companies had entered into borrowing agreements that limited the lenders' discretion to set interest rates by expressly tying those rates to the borrowers' leverage ratios. *Id.* at 236 & n.9. These agreements established an "objective decisionmaking process" for setting interest rates. *Id.* at 234. The Court therefore determined that the defendants' false statements were only material if they misstated the leverage ratios to such a degree that it affected the interest rate their companies were charged under the terms of a borrowing agreement. *See id.* at 234.

The Court upheld one conviction because the misstatement led the companies to receive a more favorable interest rate. *See id.* at 235-36. However, it reversed another conviction because the defendants did not misstate the leverage ratios to such a degree that it could have affected the bank's interest rate determination. *Id.* at 236.

-18-

In an objective decision-making context, misstatements are immaterial even if they are relevant to the decision-making process but are not capable of influencing the outcome of that process. *See United States v. Litvak*, 808 F.3d 160, 174 (2d Cir. 2015). The defendant in *Litvak* was a bond trader who lied to investment funds that were partly funded by the Department of Treasury. *See id.* at 166 & n.2. Those lies potentially affected the price at which the funds agreed to purchase mortgage-backed securities from the defendant. *See id.* at 167, 171-72. Based on these lies, the bond trader was convicted of fraud against the United States, 18 U.S.C. § 1031, and false statements, *id.* § 1001. *See* 808 F.3d at 170.

This Court reversed the convictions because the government failed to prove materiality. The parties agreed that the relevant decision-maker was the Treasury, and there was evidence that the Treasury's returns on its investments had been diminished as a result of the defendant's lies. *Id.* at 171-72. However, the defendant's lies did not affect any pricing or purchasing decisions. *Id.* at 172-74. The evidence at trial showed that the Treasury had no authority to tell the funds' investment managers whether to purchase an asset or the price at which to purchase it. *Id.* at 171-72. Because of the "exacting circumscription" of the Treasury's decision-making role, the government did not establish that the defendant's misstatements were capable of influencing a decision of the Treasury. *Id.* at 174.

*Litvak* and *Rigas* thus establish that a misstatement is immaterial if it could not influence an outcome under the factors an objective decision-maker employs to make its decision. *See also Kungys v. United States*, 485 U.S. 759, 774 (1988) (false date and place of birth given in naturalization petition not material to INS because unrelated to qualifications for citizenship); *United States v. Ismail*, 97 F.3d 50, 60-61 (4th Cir. 1996) (reversing for insufficient evidence where there was no evidence false bank signature card could influence any FDIC decision); *United States v. Facchini*, 874 F.2d 638, 644 (9th Cir. 1989) (en banc) (false statements not material given "limited" federal role in an Oregon state benefits program); *United States v. Qaisi*, 779 F.2d 346, 348 (6th Cir. 1985) (statement not material where misstated fact cannot be basis of agency's decision).

Here, it was Ditech itself that identified the funds as an overpayment, prompting the reimbursement to Guldi. Davidson's misrepresentations had to do with her authority to communicate with Ditech about the account and receive the payments on Guldi's behalf. Even assuming the falsity of Davidson's representations, the deceptiveness was superfluous. It had no influence on Ditech's decision on whether to issue a reimbursement. Ditech's decisionmakers were completely sheltered from any misrepresentation Davidson may have made. Indeed, Davidson communicated only with customer service. The evidence was thus insufficient to establish that the false statements were material.

## II. THE DISTRICT COURT ABUSED ITS DISCRETION WHEN IT DENIED DAVIDSON'S MOTIONS FOR SEVERANCE OR A MISTRIAL

Pursuant to Rule 8(b) of the Federal Rules of Criminal Procedure, multiple defendants are properly joined "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b). There is a presumption that defendants should be tried together when joinder is proper, and that presumption is even stronger when "the crime charged involves a common scheme or plan." *United States v. Ramos*, 346 F. Supp. 2d 567, 569 (S.D.N.Y. 2004) (citation omitted). That said, even where joinder is proper, a court has discretion to sever a trial where "joinder of . . . defendants in an indictment . . . appears to prejudice a defendant[.]" Fed. R. Crim. P. 14(a). That is, severance may be granted when a defendant has demonstrated that a failure to sever would cause "substantial prejudice in the form of a miscarriage of justice." *United States v. Page*, 657 F.3d 126, 129 (2d Cir. 2011) (citation omitted).

"A district court's denial of a motion to sever is reviewed only for abuse of discretion, and will not be overturned unless the defendant demonstrates that the failure to sever caused him substantial prejudice in the form of a miscarriage of justice." *United States v. Page*, 657 F.3d 126, 129 (2d Cir. 2011) (internal quotation marks omitted). "[This Court] review[s] for abuse of discretion a district

court's denial of a motion for a mistrial . . . ." *United States v. Zemlyansky*, 908 F.3d 1, 9 n.3 (2d Cir. 2018).

"Mutually antagonistic defenses are not prejudicial per se." *Zafiro v. United States*, 506 U.S. 534, 538 (1993). And "mere finger pointing" between or among co-defendants does not require severance. *See United States v. Casamento*, 887 F. 2d 1141, 1154 (2d Cir. 1989) (internal quotation marks omitted). Nonetheless, the existence of antagonistic defenses may necessitate severance where a defendant shows "that the conflict is so irreconcilable that acceptance of one defendant's defense requires that the testimony offered on behalf of a codefendant be disbelieved." *See United States v. Tutino*, 883 F.2d 1125, 1130 (2d Cir. 1989); *see also United States v. Carpentier*, 689 F.2d 21, 28 (2d Cir. 1982) (describing mutually antagonistic defenses as occurring when "the jury, in order to believe the core of testimony offered on behalf of that defendant, must necessarily disbelieve the testimony offered on behalf of his co-defendant."). Where the requisite prejudice is shown, it is in the court's sound discretion to determine whether to sever the trials or otherwise provide any relief. *Zafiro*, 506 U.S. at 538-39.

In *Copeland*, co-defendants Robertino Vasquez, Edward Copeland, and Virgil Rivers were scheduled to be jointly tried for robbing a bank. 336 F. Supp. 2d at 223. The issue there was "whether severance is warranted when a co-defendant offers, in contradiction of the government's theory, a neutral third party's

exculpatory identification testimony implicating another codefendant." *Id.* at 224–25. Ultimately the court concluded that the case presented the rare circumstance where one defendant has "averred specific facts that will be elicited by neutral witness testimony" and "the prejudice stemming from a neutral third party's identification testimony is far more prejudicial than mere self-serving finger-pointing testimony by co-defendants." *Id.* at 225. Accordingly, the court granted defendant Copeland's motion to sever. Id.

In *United States v. Basciano*, the court reached a similar conclusion. Although the defendants in *Basciano*, were unable to argue that their co-defendant expressly represented an intention to call a neutral third party to testify at trial, the court found that severance was warranted. No. 05-CR-060 (NGG), 2007 WL 3124622, at *8 (E.D.N.Y. Oct. 23, 2007). In so finding, the court emphasized that co-defendants had "no way of knowing with certainty whether Basciano's defense counsel will take this approach… [t]he defense strategy posited by the Codefendants, however, is more than bald conjecture…" *Id.* Relying on Copeland, the court reasoned that the "likelihood of antagonistic defenses" supported through the potential neutral third-party testimony, rose to the level of prejudice warranting severance. *Id.* at 9.

It was also an abuse of discretion for the district court to deny Davidson's motions for a mistrial. A mistrial "may be granted where something has occurred

to interfere with the defendant's right to a fair trial." *United States v. Yannai*, 791 F.3d 226, 242 (2d Cir. 2015).

Davidson first moved for a mistrial after counsel for Guldi concluded her opening statements. In the opening, counsel previewed Guldi's defense, a central component of which was that Guldi relied upon and was deceived by Davidson, who was the only guilty party.

At the conclusion of Guldi's opening statement, counsel for Davidson objected and moved for a mistrial. Counsel for Davidson indicated that Guldi's defense team was acting as a second prosecutor, which was a surprise to Davidson's defense team, and alluded to an understanding that Davidson would abandon blaming Guldi because their good-faith defenses would complement each other. (A 52)

Guldi's defense was clearly antagonistic to Davidson, calling for at least a limiting instruction, which was not given. But, in any event, Guldi's defense was arguably so prejudicial such that mistrial was warranted. *See United States v. Williams*, 585 F.3d 703, 710 (2d Cir. 2009) ("[T]he jury could not have ignored the parade of guns and photographs that the Government put before it, which was a major focus of the prosecutor's closing arguments."); *United States v. Colombo*, 909 F.2d 711, 715 (2d Cir. 1990) (reference to rape and sodomy in trial for RICO

and conspiracy to distribute narcotics overcomes presumption that jury followed

instruction and disregarded evidence).

### III. RESENTENCING IS REQUIRED BECAUSE THE DISTRICT COURT MISCALCULATED THE GUIDELINES RANGE AND THE WRITTEN JUDGMENT VARIES FROM THE ORAL PRONOUNCEMENT

#### A. Standards of review.

In this case, the district court failed to properly calculate the guideline range.

As Davidson preserved her objection to this erroneous calculation before the

district court, this Court should apply a "deferential abuse-of-discretion standard of

review." *Gall v. United States*, 552 U.S. 38, 52 (2007); *see, e.g.*, *United States v.*

*Barrera*, 834 F. App'x 690, 691 (2d Cir. 2021) (discussing the applicability of this

standard to the review of the procedural reasonableness of a sentence when the

error is preserved.) "A court abuses its discretion if (1) it relies on an erroneous

view of the law, (2) its decision rests on a clearly erroneous finding of fact, or

(3) its decision—though not necessarily the product of a legal error or a clearly

erroneous factual finding—cannot be located within the range of permissible

decisions." *Yannai*, 791 F.3d at 242. The Court reviews a district court's

conclusions of law de novo and its application of the Guidelines on issues of fact

for clear error. *E.g.*, *United States v. Ebbers*, 458 F.3d 110, 126 (2d Cir. 2006).

The Supreme Court has explained that a sentencing judge "should begin all

sentencing proceedings by correctly calculating the applicable Guidelines range."

*Gall*, 552 U.S. at 49. "Violation of the duties to correctly calculate the Guidelines, to consider the section 3553(a) factors, and to state the reasons for the particular sentence imposed can all give rise to an appellate determination of procedural unreasonableness." *United States v. Pugh*, 945 F.3d 9, 25 (2d Cir. 2019).

"[I]n the event of variation between an oral pronouncement of sentence and a subsequent written judgment, the oral pronouncement controls . . . ." *United States v. Rosario*, 386 F.3d 166, 168 (2d Cir. 2004).

## B. Discussion.

There was a variance between the court's orally imposed sentence and the written judgment. The district court did not impose sentence until January 2024, as the court itself explicitly stated. However, the written judgment stated that the sentence was imposed on October 4, 2023. The judgment must be corrected and the district court must calculate the correct Guidelines range under the 2023 version of the Guidelines Manual.

On October 4, 2023, the district court orally pronounced, but did not yet impose, a sentence of nine months custody on each count to run concurrently and three years' supervised release of which the first nine months shall be home confinement. The court continued the sentencing hearing to December 6, 2023, to resolve issues raised at the October 4 hearing relating to restitution and surrender. At the December 6 continued sentencing hearing, the district court indicated that it

would no longer grant an extended surrender date but would entertain a motion for bail pending appeal under 18 U.S.C. § 3143. The district court heard brief argument and granted the government's request to further brief its opposition to bail.

Finally, on January 9, 2024, the district court imposed sentence. In the course of a discussion between defense counsel and the court about which version of the Guidelines applied, the district court unequivocally stated that the 2023 version applied. (A 314-15). Despite the district court's statement from the bench, the written judgment reflected that the sentence was imposed on October 4, 2023. If there is a variance between the oral pronouncement of sentence and the written judgment of conviction, the oral sentence generally controls. *E.g.*, *United States v. DeMartino*, 112 F.3d 75 (2d Cir. 1973). The district court must hold a new sentencing hearing to clarify the date of imposition of the sentence. *See United States v. Jolly*, 142 F.3d 552 (2d Cir. 1998).

A new sentencing hearing is also necessary to have the district court calculate the correct offense level and Guidelines range. Sentencing courts must apply the Guidelines Manual in effect at the time of sentence unless to do so would violate the *ex post facto* prohibition. *E.g.*, *United States v. Fitzgerald*, 232 F.3d 315, 318-19 (2d Cir. 2000) (per curiam); *see also* 18 U.S.C. § 3553(a)(4)(A)(ii) (requiring sentencing courts to consider "the kinds of sentence and the sentencing

-27-

range established . . . as set forth in the guidelines— that . . . are in effect on the date the defendant is sentenced"). As noted above, the district court itself conceded that it did not impose sentence until January 2024, making the 2023 Manual the effective Guidelines.

Section 3582(c) of Title 18 of the United States Code and Rule 35 of the Federal Rules of Criminal Procedure further support what the district court conceded. Together, those laws severely restrict a sentencing court's ability to modify a sentence once it has been "imposed." *See generally* 18 U.S.C. § 3582(c) ("[T]he court may modify an imposed term of imprisonment to the extent otherwise expressly permitted by statute or by Rule 35 of the Federal Rules of Criminal Procedure."); Fed. R. Crim. P. 35. Because of the law's rigidity, courts, including this Court, have interpreted the phrase "imposed term of imprisonment" to allow a sentencing court to adjourn a sentencing hearing and adjust the sentence even after the court has articulated its intended sentence. *See, e.g.*, *United States v. Twersky*, 133 F.3d 908 (2d Cir. 1997) ("If the court orders such an adjournment of the sentencing hearing, its initial articulation at that hearing does not constitute the 'imposition of sentence,' and no sentence was then 'imposed,' within the meanings of Rule 35 and § 3582(c), respectively."); *United States v. Bonito*, 57 F.3d 167, 176 (2d Cir. 1995) ("We see no reason for interpreting § 3582(c)'s use of 'imposed' with undue rigidity, so as to lock a judge into an articulation of sentence

-28-

based on misinformation, or one sided information, under these circumstances."); *United States v. Marquez*, 506 F.2d 620, 622 (2d Cir. 1974) ("At sentencing proceedings[,] discussion subsequent to an initial ruling may result in the court's modifying its initial pronouncement, all before its ruling becomes 'final.'"). Thus, even without the district court's concession, the law is clear that the district court's initial articulation of the sentence did not constitute "imposition" of that sentence because the sentencing hearing was interrupted and adjourned for the parties to provide the court with further information.

Because the Guidelines in effect at the time of sentence here was the 2023 manual, the district court was required to calculate the Guidelines under the amended, 2023 Guidelines. Because Davidson was a zero-point offender, the 2023 Guidelines reduced the Offense Level two levels,[9] resulting in a sentencing range of 30 to 37 months. However, the court calculated the Guidelines range only once, on October 4, 2023, at which time the 2021 Manual was in effect. Under the 2021 Guidelines, Davidson's Guidelines range was 37 to 46 months.

Before the October 4, 2023, sentencing hearing, the parties jointly recommended a variance from the 37-to-46 month range and urged the court to

---

[9] New Guideline § 4C1.1 provides a 2-level reduction for so-called "Zero-Point Offenders" who meet ten criteria, chiefly that "the defendant did not receive any criminal history points from Chapter Four, Part A." U.S. Sent'g Guidelines § 4C1.1(a)(1) (2023).

sentence Davidson as if the two-level reduction applied. However, the court was still required to accurately and independently calculate the sentencing range under the correct guidelines. It did not do so despite defense counsel's preservation of the issue. *See* A 314-15 ("So now, before -- her guidelines range is actually two -- her offense level is actually two levels lower."). Thus, the judgment must be vacated and the case remanded for the district court to accurately calculate the guidelines range.

## CONCLUSION

The judgment of the district court should be reversed with instructions to dismiss or enter a judgment of acquittal on the counts of conviction. In the alternative, the judgment should be vacated and the case remanded for a new trial or resentencing.

Dated:      Wilton, Connecticut
             July 2, 2024

                           Respectfully submitted,

                              /s Ezra Spilke
                         EZRA SPILKE
                         Law Offices of Ezra Spilke
                         1825 Foster Avenue, Suite 1K
                         Brooklyn, NY 11230
                         T: 718-783-3682
                         ezra@spilkelaw.com

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure, the foregoing brief contains 7,152 words according to the word count function of the MS Word application and is, thus, in compliance with the type-volume limitation set forth in Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure and Local Rule 32.1(a)(4)(A). The typeface – 14-point, Times New Roman – complies with Rule 32(a)(5)(A) of the Federal Rules of Appellate Procedure.

Dated:      Wilton, Connecticut
             July 2, 2024

          Respectfully submitted,

            /s Ezra Spilke
          EZRA SPILKE
          Law Offices of Ezra Spilke
          1825 Foster Avenue, Suite 1K
          Brooklyn, NY 11230
          T: 718-783-3682
          ezra@spilkelaw.com